## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 3:13-cr-175 (MRB)** |
| | : | |
| **LANCE EALY** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

### UNITED STATES' RESPONSE TO *PRO SE* DEFENDANT'S
### POST-TRIAL MOTIONS FOR RELIEF (R. 173, R. 175)

The United States of America, by and through its attorney, Carter M.

Stewart, United States Attorney for the Southern District of Ohio, and the

undersigned Assistant United States Attorneys, hereby files the following

opposition to *pro se* Defendant's Post-Trial Motions for Relief (R. 173, filed Nov. 26,

2014, and R. 175, filed Dec. 1, 2014). For the reasons below, the United States

respectfully requests to deny Ealy's motions in their entirety.

### BACKGROUND

On October 28, 2014, Ealy's trial pursuant to the Second Superseding

Indictment began. On November 17, 2014, Ealy failed to appear for trial, and trial

proceeded *in absentia*. Before proceeding *in absentia*, the Court heard from

members of the United States Pretrial Services office ("USPS") and the United

States Marshal's Service regarding their efforts to locate Ealy. The Court ultimately

determined that Ealy had voluntarily absented himself and maintained the

1

issuance of an arrest warrant for violation of bond conditions.[1]  The Court also revoked Ealy's *pro se* status, allowed stand-by counsel, Assistant Federal Public Defender Thomas Anderson to complete the trial, and ultimately assigned James Fleisher to represent Ealy for purposes of sentencing.  On November 19, 2014, the jury convicted Ealy of all 46 counts in the Second Superseding Indictment.  Ealy remains presently at large.

Despite his fugitive status, Ealy managed to file omnibus *pro se* motions on November 26, 2014 (R. 173) and December 1, 2014 (R. 175).  These motions include a litany of allegations, and request that the Court enter a judgment of acquittal, or in the alternative, order a new trial and have the presiding Judge recuse himself (collectively "Post-Trial Motions").

## ARGUMENT

### A. Defendant's Post-Trial Motions should be dismissed because Defendant is a fugitive from this Court.

The Court should dismiss Ealy's Post-Trial Motions under the "fugitive disentitlement doctrine."  The Sixth Circuit has recognized the fugitive disentitlement doctrine, stating:

> The fugitive disentitlement doctrine limits access to courts in the United States by a fugitive who has fled a criminal conviction in a court in the United States. The doctrine is long established in the federal and state courts, trial and appellate.

---

[1] The Court had issued an arrest warrant two days before on November 15, 2014 violation of bond conditions when it determined Defendant had fled his residence and removed his electronic monitoring device.

*In re Prevot*, 59 F.3d 556, 562 (6th Cir. 1995).  The fugitive disentitlement doctrine is an equitable remedy. *Id.*

The Sixth Circuit has applied the fugitive disentitlement doctrine to dismiss criminal appeals. *See United States v. Lanier*, 123 F.3d 945, 946 (6th Cir. 1997); *United States v. Yang*, 144 Fed. Appx. 521, 522 (6th Cir. 2005); *United States v. Smith*, 49 Fed. Appx. 599 (6th Cir. 2002).  While suggesting that the fugitive disentitlement doctrine does not apply to fugitives before or during the trial of a criminal case, [2] or may not apply to matters filed when the former fugitive is no longer a fugitive (*see, e.g.*, *United States v. Smith*, 419 F.3d 521, 526 (6th Cir. 2005)), the Sixth Circuit has suggested its application with regard to post-trial motions. *See Prevot*, 59 F.3d at 564 & n.8 (citing *United States v. Sacco*, 571 F.2d 791 (4th Cir. 1978).

In *Sacco*, an issue arose during trial about the source of certain government evidence and whether it was the product of an allegedly improper wiretap. 571 F.2d at 792.  After Sacco objected, the district court let the trial proceed and ultimately decided to set the matter for a post-trial taint hearing if Sacco was found guilty. *Id.* After Sacco was convicted, he began the process of litigating the post-trial taint hearing, but ultimately fled during the pendency of his taint motion. *Id.* The district court dismissed his motion, finding that he had waived his motion when he fled. *Id.* at 793.

---

[2] Since *Prevot*, at least one district court in the Sixth Circuit has applied the fugitive disentitlement rule to a pretrial motion. *United States v. Bakari*, 2014 WL 1745659, at **2-3 (E.D. Tenn. 2014) (after district court found Bakari was a fugitive in Jordan, it denied his motion to dismiss the indictment filed by American counsel under the fugitive disentitlement doctrine).

The case here is no different.  Ealy is a fugitive, having cut off his monitoring device, broken contact with Pretrial Services, and fled his residence in violation of the Court's pretrial release conditions.  By virtue of the Post-Trial Motions (and the manner in which they were filed, namely through persons known to be associated with Ealy), he is certainly aware of his fugitive status.  Nonetheless, Ealy attempts to litigate the Pending Motions from afar all the while refusing to otherwise submit to this Court's jurisdiction.  Based on Ealy's conduct, the Court should apply the fugitive disentitlement doctrine and dismiss Defendant's Pending Motions.

### B. Overwhelming evidence supports Defendant's convictions.

Defendant's motion for acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure should be denied. In considering a motion for judgment of acquittal, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Allen*, 619 F.3d 518, 522 (6th Cir.2010). The critical inquiry is "whether the record evidence could reasonably support a finding of guilty beyond a reasonable doubt." *United States v. Davis*, 490 F.3d 541, 549 (6th Cir. 2007) (citation omitted).  The Court must draw "all available inference and resolve all issues of credibility in favor of the [jury's] verdict." *United States v. Wade*, 318 F.3d 698, 701 (6th Cir. 2003) (internal quotation marks omitted). But the court "must not 're-weigh the evidence, re-evaluate the credibility of witnesses, or substitute its judgment for that of the jury.'" *United States v. Ouedraogo*, 837 F.

4

Supp. 2d 720, 724 (W.D. Mich 2011), (quoting *United States v. Johnson*, 443 Fed. Appx. 85, 91 (6th Cir. 2011)); *see also United States v. Walls*, 293 F.3d 959, 967 (6th Cir. 2002) (district court should not make independent determinations regarding the credibility of witnesses or the weight to be given such evidence) (citing *United States v. Welch*, 97 F.3d 142, 148-151 (6th Cir. 1996)). "Accordingly, defendants bear a heavy burden when asserting insufficiency of the evidence arguments." *United States v. Wettstain*, 618 F.3d 577, 583 (6th Cir. 2010) (citing *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999)). Moreover, "[c]ircumstantial evidence alone, if substantial and competent, may sustain a conviction under this deferential standard of review." *United States v. Beverly*, 369 F.3d 516, 531 (6th Cir. 2004) (internal quotation marks omitted).

There was sufficient evidence proving beyond a reasonable doubt that Defendant committed the offenses for which he was convicted.[3] In this case, Defendant was convicted of 46 separate counts arising from the Second Superseding Indictment. These included sixteen counts of aggravated identity fraud (18 U.S.C. § 1028(a)(1)), sixteen counts of wire fraud (18 U.S.C. § 1343), eleven counts of presenting false claims against the United States (18 U.S.C. § 287), one count of unauthorized use of access devices (18 U.S.C. § 1029(a)(2) and (b)(1)), one count of mail fraud (18 U.S.C. § 1341), and one count of possessing an unauthorized/counterfeit access device (18 U.S.C. § 1029(a)(3)).

---

[3] In responding to Defendant's Pending Motions, the United States does not have a transcript of the trial proceedings, but rather is relying on the collective recollection of the undersigned Assistant United States Attorneys and the exhibits admitted as evidence at trial.

To prove wire fraud (18 U.S.C. § 1343), the United States was required to show Defendant: (1) devised or willfully participated in a scheme to defraud; (2) used or caused to be used interstate wire communication in furtherance of the scheme; and (3) intended to deprive a victim of money or property. *See, e.g.*, *United States v. Cunningham*, 679 F.3d 355, 370 (6th Cir. 2012).

To prove mail fraud (18 U.S.C. § 1341), the United States had to show that Defendant: (1) knowingly devised a scheme to defraud, (2) with the intent to defraud, and (3) mailed something or caused another to mail something to implement the scheme. *United States v. Gold Unlimited, Inc.*, 177 F.3d 472, 478 (6th Cir. 1999).

With respect to aggravated identity theft (18 U.S.C. § 1028A(a)(1)), the United States had to prove that Ealy: 1) knowingly transferred, possessed, or used a means of identification belonging to another person; 2) knew the means of identification belonged to another person; 3) knew he lacked lawful authority to transfer, possess, or use the means of identification; and 4) transferred, possessed, or used the means of identification during and in relation to a predicate felony offense listed in 18 U.S.C. § 1028A(c). *United States v. Jacobs*, 545 Fed. Appx. 365, 366 (6th Cir. 2013).  "Additionally, the fourth element requires there to be sufficient evidence that the defendant committed the underlying predicate felony offense, even if that offense is not charged in the indictment." *Id*.  As to each count of aggravated identity theft, the predicate felony offense alleged in Defendant's case was wire fraud as set forth in the Second Superseding Indictment.

6

To prove presentation of false claims against the United States (18 U.S.C § 287), "the government must prove that: 1) the defendant presented a false or fraudulent claim against the United States; 2) the claim was presented to an agency of the United States; and 3) the defendant knew that the claim was false or fraudulent." *United States v. Reesor*, 10 Fed. Appx. 297, 307 (6th Cir. 2001).

To prove attempted unauthorized use of access devices (18 U.S.C. § 1029(a)(2) and (b)(1)), the United States had to prove "1) the intent to defraud; 2) the knowing use of or trafficking in an unauthorized access device; 3) to obtain things of value in the aggregate of $1,000 or more within a one-year period; and 4) an effect on interstate or foreign commerce." *United States v. Tunning*, 69 F.3d 107, 112 (6th Cir. 1995).

Finally, as to possession of unauthorized or counterfeit access device (18 U.S.C. § 1029(a)(3)), the United States was required to prove that Defendant: knowingly and with intent to defraud possessed fifteen or more devices which are counterfeit or unauthorized access devices in or affecting interstate or foreign commerce. *United States v. Drummond*, 255 Fed. Appx. 60, 65 (6th Cir. 2007) The Sixth Circuit has observed that possession of a counterfeit credit card even without its use is sufficient to establish a violation of 18 U.S.C. § 1029(a)(3), as "affect[ing] interstate or foreign commerce was intended by Congress to establish a broad jurisdictional basis." *Drummond*, 255 Fed. Appx. at 65-66 (internal quotations omitted) (finding sufficient evidence existed to find interstate/foreign commerce affected when defendant possessed twenty-one credit card numbers on a

sheet of paper, many of which had been issued by foreign banks) (citing *United States v. Rushdan*, 870 F.2d 1509, 1513 (9th Cir. 1989)).

### 1. The tax refund scheme (Counts 2-42).

Counts 2-42 generally dealt with a scheme in which Ealy used others' personal identifying information (*i.e.*, PII) to electronically file false tax returns with the IRS. Ealy's submissions caused various interstate wires to process the false claims and approve disbursement of tax refunds, resulting in some fraudulent tax refunds being deposited into bank accounts that were opened using the personal identifying information of additional people. After the funds were electronically deposited into the accounts, Ealy (or others associated with him) would, among other things withdraw the funds from ATMs in the Southern District of Ohio.

As to Counts 2-12 (18 U.S.C. § 287), the evidence at trial demonstrated that fraudulent tax returns were electronically submitted to the IRS, all of which included claims for improper tax refunds. None of the bank accounts into which the tax refunds were to be deposited were opened in the name of the alleged filers. (Govt. Exs. 1.1, 1.2, 1.3, 1.4, 1.5, 1.6., 1.7, 1.8, 1.9, 1.10, 1.11, 2.1-2.9). The United States presented eight witnesses[4] (representing Counts 2-4, 6-8, and 10-12) who testified that: 1) they never filed or authorized the filing the returns, 2) the information contained in the returns was false (aside from their personal identifying information), 3) they did not seek the listed refunds, and 4) that they were unfamiliar with the bank accounts into which the refunds were deposited.

---

[4] These were Maudie Patton, Joshua Chambers, Dwayne Berry, Timothy Norwood, Alice Teftt, Shayvion Myers, Diane Woyton, and Jacqueline Goodridge.

With regard to Yvonne Simoneau and the information in her alleged tax return (Count 9), her son Troy Piiarinen testified that he assisted his mother with her finances and that the address given for her residence was false, that she did not work at the employer listed in the return, and that she did not possess the listed bank account. As to the final two alleged filers (Sherri Ford and Foster Roberts, false claims filed in their names as alleged in Counts 5 and 10), the information in the returns did not match the third party employer tax information provided to the IRS, and the refunds were also to be deposited into fraudulently opened bank accounts, indicating these tax returns were also fraudulent.[5] IRS Special Agent Brad Bierman and Tim Mathers (an IRS records custodian) both testified that the IRS is an agency of the Treasury Department of the United States. Thus, it is undisputed that the false tax refund claims were made against the United States.

Furthermore, Mathers and Special Agent Bierman both testified that the tax returns were filed electronically, which was reflected on the face of the returns, IP information associated with the returns, and through the routing numbers. (Govt. Exs. 1.1-1.11C). Mathers also testified that all of the tax returns were electronically transmitted to Martinsburg, West Virginia (with the lone exception of Sherri Ford's tax return, which was sent to Memphis, Tennessee), and that the tax returns/refund requests were ultimately electronically transmitted to processing centers in other states for final payment instructions. Thus, the fraudulent claims were filed and processed using interstate wires (Counts 13-23). Importantly, the evidence showed

---

[5] Special Agent Dolinger testified he interviewed Foster Roberts, who he found to be an elderly bedridden man, inconsistent with Foster Roberts allegedly being employed at a construction company the prior year.

that the personal identifying information used to file these fraudulent returns was found in an email account controlled by Ealy, and the refunds were directed to bank accounts that were opened and accessed by Ealy (as evidenced by, among other things, physical evidence recovered from Ealy's residence and surveillance footage from US Bank and JPMorgan Chase).

As to the aggravated identity fraud, eight of the alleged tax filers testified that their name and legitimate social security number were improperly used to file the returns (Counts 24-26, 28-30, and 33-34). Troy Piiarinen identified his mother's social security number reflected on the alleged Yvonne Simoneau return (Govt. Ex. 1.9), and testified that information contained in the tax return in her name was false or fraudulent (Count 31). As to Foster Roberts and Sherri Ford, Mathers and Special Agent Bierman testified that a social security number had to be legitimate to process the return; because the tax returns were electronically accepted by the IRS, they were in fact real social security numbers. Ealy's use of the eleven alleged filers' personal identifying information (all of which was unauthorized) was transmitted in conjunction with the electronic wiring of the tax returns, and thus was during and in relation to the wire fraud alleged in Counts 13-23.

Once the returns were processed, tax refunds for three of the returns were electronically deposited into bank accounts. Mathers testified that the tax return documents reflected that money was paid into the bank accounts as listed on the returns, pursuant to payment instructions wired across state lines from the IRS Submission Processing Center in Austin, Texas to an IRS facility in Kansas City,

10

Missouri (Counts 35-37).[6]  This was confirmed by J.P. Morgan Chase records for the three bank accounts. (Govt. Exs. 2.3B, 2.5A, 2.9C).  One of the returns was paid by paper check, which Tim Mathers testified is exclusively sent via the United States Postal Service (Count 38).  Shayvion Myers testified that the tax refund check sent in his name by mail was fraudulent, as he did not seek such refund. (Govt. Ex. 1.12).

Counts 39-41 dealt with the use of personal identifying information to open the bank accounts into which the fraudulent refunds were deposited (obtained through the wire fraud set forth in Counts 35-37, and thus during and in relation to the wire fraud).  Specifically, Joyce Furl, Kenneth Maxey, and Ronald Ploski each testified that their actual name and social security number were used to open the J.P. Morgan Chase bank accounts, and that they did not open or authorize others to open the accounts.

As to Count 42, representatives of the J.P. Morgan Chase and U.S. Bank (namely Tammy Rider and Dean Crothers respectively) testified that their ATM machines were subject to surveillance, and that particular transactions at those ATM machines were photographically captured. (Govt. Exs. 14.1-14.3, 15.1, 15.2, 15.8-15.10, 15.12, 15.14, 15.18, 15.21, 15.22, 15.25-15.27, 15.30, 15.33).  On several occasions, the surveillance footage showed Ealy personally withdrawing money from the ATM machines, which required use of an ATM card (a "device") to access the

---

[6] Timothy Norwood, Dwayne Berry, and Joshua Chambers all testified they did not file or authorize the filing of the tax returns seeking refunds that were the subject of the electronic wires described.

money in the bank accounts.[7] (Govt. Exs. 14.2, 15.1-15.32). Tammy Rider and Dean Crothers' testimony collectively showed that the withdraws all took place in the Southern District of Ohio between April and November 2013, with the aggregate amount withdrawn exceeding more than $1000 during a twelve month period.[8] (Govt. Exs. 14.3, 15.33). Each of the bank accounts from which the money was withdrawn were fraudulently opened (as Kenneth Maxey, Joyce Furl, Robert Ploski, and Thomas Aldridge testified). (Govt. Exs. 2.2, 2.3, 2.4, 2.5, 2.9, 3.4, 14.3, 15.33).

In his Post-Trial Motions, Ealy's primary complaint is that the United States did not prove that he was the person who filed the fraudulent tax returns, used the personal identifying information, or caused the IRS to make the interstate wires. To this point, substantial evidence confirms his guilt, set forth in a non-exhaustive list below.

*First*, Ealy was repeatedly captured on ATM surveillance withdrawing money from the bank accounts into which the stolen tax refunds were deposited. By having the ATM cards necessary to access the bank accounts to profit from the fraud, this in part proves he filed the tax returns.

---

[7] In fact, Defendant can be clearly observed withdrawing an aggregate of $1000 by himself within just three transactions. (Govt. Exs. 15.11, 15.16 15.23, 15.33). On a few occasions, the photo or video angle either captured only Defendant's vehicle or someone associated with Defendant withdrawing money while Defendant appeared to be present in the vehicle. On those occasions, it was reasonable to conclude that this was done by Defendant or at his direction. On one occasion, Defendant's girlfriend withdrew money using an ATM card; it could likewise be inferred, though not necessary to find Defendant guilty of this count in light of the other withdraws totaling over $1000, that her access was a product of Defendant's conduct.

[8] Defendant was charged with attempted unauthorized use of the access devices; certainly a substantial step was proven because Defendant actually completed the offense by obtaining the money.

*Second*, various financial documents belonging to others were found in Defendant's home at 1622 Rangeley, Dayton, Ohio.[9] (Govt. Exs. 33.6, 33.9, 33.10, 33.13- 33.23, 33.25, 33.26, 33.29-33.32).   Included among these documents was paperwork for a bank account in Joyce Furl's name, the same account into which Timothy Norwood's fraudulent tax refund was ultimately deposited. (Govt. Exs. 1.6, 2.3 33.15, 33.17, 33.20).   Additionally, various bank paperwork in Anthoni O'Niel's name was likewise found in Defendant's home; a bank account in Anthoni O'Niel's name was the intended destination for the fraudulent tax refund listed in Diane Woyton's fake tax return. (Govt. Exs. 1.11, 2.1, 33.16, 33.21, 33.23, 33.25).

*Third*, computers retrieved from Ealy's home at 1622 Rangeley Avenue contained searches for topics such as tax fraud (*e.g.*, Govt. Ex. 22.3I, pg. 11, rows 6504-6506; 22.3I pg. 12, row 6886- 6887) and carding forums (*e.g.*, Govt. Ex 22.1C, pgs. 4-5; 22.3B, pgs. 1-2).  Furthermore, the email account lanceealy@yahoo.com was also accessed from computers seized from 1622 Rangeley. (*e.g.*, Govt. Exs. 22.1, rows 151-153; 22.3E, pg. 1, row 11).

*Fourth*, Ealy's cell phone (physically taken from him by Special Agent Mary Turk) contained emails related to fraudulent bank accounts opened in the name of Joyce Furl, Kenneth Maxey, and Ronald Ploski, the same names used to open bank

---

[9] Joe Morgan testified that George Morgan was confined to a nursing home, was mentally impaired, and that he was George Morgan's guardian.  Marva Cosby, Anthoni O'Niel's mother, testified that he was paralyzed and confined to a nursing home, and did not have connection to the bank account paperwork in Defendant's home.  Virginia Kaldmo testified that she did not seek a Visa card from Jackson Hewitt, did not know Defendant, and had no tie to 1622 Rangeley. Finally, Thomas Aldridge and Joyce Furl testified that they did not open the bank accounts for which paperwork was found in Defendant's home, and that they did not know Defendant.  The presence of these documents in part proved Defendant's identity as the person who opened these accounts and carried out the charged offenses.

accounts and listed to receive the requested tax refunds. (Govt. Exs. 1.1, 1.2, 1.3, 1.4, 1.6, 1.8, 1.9, 1.10, 1.24, 2.2, 2.3, 2.4, 2.5, 2.9, 24.3).  Additionally, the email accounts Lanceealy@yahoo.com and Lowelltoms@yahoo.com were contained in the cell phone, which were used to open fraudulent bank accounts and/or communicate with Hieu Minh Ngo (who was the source of the PII that Ealy used to file the fraudulent tax returns) and Special Agent Matthew O'Neill (in an undercover capacity). (Govt. Exs. 3.4A, 3.5A, 24.1, 41.177-41.193, 47.6).  Hieu Minh Ngo's email address, wangsangpi@gmail.com, was also saved as a contact in Ealy's phone. (Govt. Ex. 24.2).

*Fifth*, the Lowelltoms@yahoo.com, Lanceealy@yahoo.com, and Lanceealy123@yahoo.com email accounts (used to carry out the fraud) are all tied to Ealy and each other, showing his control of them.

As to Lanceealy@yahoo.com, again this email account was accessed through Ealy's phone.  Ealy used Lanceealy@yahoo.com to communicate with his college professors, provided the email address to Central State University (as shown in his college records dating back to at least 2009), and tied the email address to his personal bank account, Facebook account, and an American Express Bluebird account. (Govt. Exs. 9.1, 18, 20.4A-20.4D, 42.7, 42.34A, 42.44, 42.63, 42.66, 42.98, 42.126, 42.181, 42.193).   In addition to the fact the email address itself bears his name, Yahoo records listed "Lance Ealy" as the subscriber with an alternative email address that was contained in Ealy's Central State University records. (Govt. Exs. 20.4D, 42A).  Defendant also provided the Lanceealy@yahoo.com email to another

14

person during a recorded call shortly after his arrest. (Govt. Ex. 26.2, Clip 2). IP address records from Time Warner Cable also showed that lanceealy@yahoo.com was accessed from Ealy's home at 1622 Rangeley Avenue. (Govt. Exs. 42A, 16.4, 16.5). Therefore, the evidence showed Ealy was the user of lanceealy@yahoo.com during the timeframe of the offenses.

With regard to the lanceealy123@yahoo.com, several facts showed Ealy's use of this email account. In the Yahoo records, the alternative email contact for lanceealy123@yahoo.com was lanceealy@yahoo.com (which also received email correspondence about lanceealy123@yahoo.com). (Govt. Exs. 43A, 42.76, 43.39). Lanceealy123@yahoo.com bears Ealy's name in the email address. Lanceealy123@yahoo.com was associated with Ealy's PayPal account, along with Lanceealy@yahoo.com. (Govt. Ex. 11.3). Furthermore, emails from PayPal regarding purchases in Ealy's name (at locations in the Dayton area) were sent to Lanceealy123@yahoo.com. (Govt. Exs. 43.15, 43.102, 43.104). Lanceealy123@yahoo.com was accessed on one of the computers taken from Ealy's home at 1622 Rangeley. (Govt. Ex. 22.1D). Lanceealy123@yahoo.com and Lanceealy@yahoo.com were often accessed within minutes of each other between March 6, 2013 and July 19, 2013 (the time frame during which Special Agent O'Neill communicated with the users of those accounts). (Govt. Ex. 52A). Water bills for Ealy's home at 1622 Rangeley were emailed to Lanceealy123@yahoo.com. (Govt. Exs. 43.82, 43.120, 43.130, 43.141, 43.144). "ReverbNation" emailed Lanceealy123@yahoo.com regarding Ealy's rap music enterprise, and email

15

notifications from Twitter and Facebook about Ealy or his rap music group were also sent there. (Govt. Exs. 37, 38, 43.84, 43.139, 42.103, 43.89, 43.132, 43.145). When corresponding with Special Agent O'Neill, the user of Lanceealy123@yahoo.com stated the Ealy's Facebook page was his, he had two children (like Ealy), he had Ealy's birthday, provided the 1486 Guenther Road address (owned by Ealy) during discussion with Special Agent O'Neill, and also provided the 823 Riverside Terrace address (which was found on bank paperwork in Thomas Aldridge's name in Ealy's home). (Govt. Exs. 33.26, 33.29-33.31, 41.119, 41.120, 41.122, 41.129, 41.165). Based on all these facts, sufficient evidence existed to prove Ealy as being in control of and the user of Lanceealy123@yahoo.com.

Ealy also the used and controlled the Lowelltoms@yahoo.com email account. In addition to this email account being found on Ealy's phone, Yahoo records show that Lanceealy@yahoo.com was an alternate email for the Lowelltoms@yahoo.com account. (Govt. Exs. 43A, 47A). Ealy's schoolwork was transferred from Lowelltoms@yahoo.com to Lanceealy@yahoo.com. (Govt. Ex. 42.38). Lowelltoms@yahoo.com sent an email to Special Agent O'Neill about "Lanceealy123," the email account controlled by Ealy as explained above. (Govt. Ex. 47.6). Central State University basketball tickets (where Ealy attended) were purchased through Lowelltoms@yahoo.com. (Govt. Ex. 22.4H, 47.14). Lowelltoms@yahoo.com was associated with bank accounts fraudulently opened in George Morgan and Thomas Aldridge's names; agents seized bank paperwork in both Aldridge and Morgan's names from Ealy's home at 1622 Rangeley. (Govt. Exs.

16

3.4A, 3.5A, 33.18, 33.26, 33.29-33.31).  One of the computers seized from Ealy's home at 1622 Rangeley accessed Lowelltoms@yahoo.com. (Govt. Ex. 22, page 190, row 166).  Finally, Lanceealy@yahoo.com and Lowelltoms@yahoo.com were accessed within 10 minutes of each other on numerous occasions between September 2, 2013 and November 25, 2013, indicating the same individual was accessing both accounts. (Govt. Ex. 52B). In sum, sufficient evidence established Ealy's as controlling and using the Lowelltoms@yahoo.com email account.

Furthermore, the personal identifying information used to file the fraudulent tax returns were contained in emails sent from Hieu Minh Ngo to Lanceealy123@yahoo.com account, further proving Defendant's identity as the person who submitted the false tax returns. (Govt. Exs. 41.8, 41.13, 41.18, 41.37, 41.45, 41.49).  Combined together, the United States proved that Ealy was the user of these three email accounts and communicated with Special Agent O'Neill and Hieu Minh Ngo.

*Sixth*, Ealy's statements immediately after his arrest demonstrated that Ealy committed the offenses.  When confronted by Special Agent Turk about the lanceealy@yahoo.com and lanceealy123@yahoo.com email accounts, Ealy claimed that he had only "heard" of those email accounts but denied using them.  In light of Ealy's use of those email accounts for various personal activities (*i.e.*, his water bills, personal banking, Facebook account, Central State University records, etc.), it was reasonable for the jury to believe that Ealy denied use of the accounts to hide his involvement. (Govt. Exs. 42.1-43.146).  After Ealy was arrested by Special Agent

17

Turk, Ealy was recorded telling another person that the Secret Service "must have found out" and that he would "probably going to end up getting probation," which were admissions of guilt. (Govt. Ex. 26.2, Clips 1, 3, and 6).

 2. The American Express card offense (Count 1 - 18 U.S.C. § 1029(a)(3)).

Ealy possessed American Express account information for more than fifteen individuals, which he emailed to O'Neill (posing as Ngo) in an attempt to purchase additional personal identifying information, giving rise to Count 1.

The United States introduced two emails sent to wangsangpi@gmail.com (operated at that time by Special Agent O'Neill) from Lanceealy123@yahoo.com, which was used by Ealy as described above. (Govt. Exs. 41.69, 41.78). Ealy sent seventeen American Express account numbers ("devices") to O'Neill, in the hopes of obtaining additional personal identifying information (referred to as "fullz" in the emails). The seventeen American Express account numbers were either active or closed account numbers that were legitimately issued by American Express, as verified by sixteen of the account holders/users[10] and Michael O'Hara, an American Express corporate representative. The account holders/users and O'Hara also testified that Ealy was not authorized to use or possess the account information contained in the emails. (Govt. Exs. 9.2-9.18, 41.68, 41.78). The manner in which Ealy possessed the American Express account numbers; his desire to trade them for others' personal identifying information; his prior use of personal identifying

---

[10] The account holders/users who testified were Dennis DeBottis, Pamela Webber, Nilay Shah, John Rubino, Paula Porea, Dana Kenney, Susan Granata, Adam Baker, Valerie Steinmann, Alfred Cisneros, Mary Dalton, Deanne Fredericks, Heidi Gallo, Sara Gerleman, Albert Tarasuk, and Jennifer Duncan-Wilson.

information from Ngo to file false tax returns; and the contents of emails between Special Agent O'Neill and Ealy before, during, and after Ealy's transmission of the American Express account information all showed that Ealy possessed the account information with intent to defraud. (Govt. Exs. 41.50-41.193).[11]

Furthermore, Ealy's possession affected interstate commerce. Multiple account holders/users (living in various states) testified that they used their American Express card to make purchases, and it was confirmed by O'Hara and the account holders/user that the account numbers were legitimately issued by American Express, a credit card company. Pursuant to the broad interpretation of "affecting interstate and foreign commerce" in *Drummond*, Defendant's conduct sufficiently affected interstate commerce.

In sum, the United States produced sufficient evidence to prove Defendant was guilty of possessing fifteen or more access devices with intent to defraud and in a manner that affected interstate commerce.

### 3. Fraud using Brenda Donnaker's information (Counts 43-44).

The government proved at trial that from approximately January 2014 until June 2014, Ealy used the personal identifying information of Brenda Donnaker to electronically open an Ally Bank account in her name and without her consent, as part of a larger payment card scheme involving other accounts at Square, Inc. and Capitol One. Defendant was charged with wire fraud (Count 43) and aggravated identity theft (Count 44) from this conduct.

---

[11] Defendant's use of the personal identifying information sent earlier to him by Ngo and used to file false tax returns also showed his intent in seeking the personal identifying information from O'Neill on this occasion.

19

Brenda Donnaker testified that she did not open or authorize the opening of accounts at Capitol One, Ally Bank, or Square, Inc.; that she did not know Ealy or authorize him to possess her personal information, and that she had no connection to 1622 Rangeley Avenue. (Govt. Exs. 6, 7, 12.1).

Peter Esz testified that an Ally Bank account was opened electronically in Brenda Donnaker's name, which caused an interstate wire transmission in the form of an email sent from Ally Bank to the fraudulent Gmail account that Ealy opened in Donnaker's name.

The government proved that Ealy opened the fraudulent Ally Bank by highlighting several key pieces of evidence. *First*, a debit card and paperwork related to a Capital One bank account opened in Brenda Donnaker's name was found in Defendant's home at 1622 Rangeley Avenue, along with a postal shipping envelope in her name. (Govt. Exs. 33.6, 33.9, 33.22). *Second*, the Square, Inc. account was connected to a Square reader (which processes credit card payments via cellphone) and tied to the Ally Bank account; GPS data from the Square reader showed many transactions occurred at Defendant's home at 1622 Rangeley and places associated with him, and agents found a Square reader and packaging in 1622 Rangeley. (Govt. Exs. 12.4, 33.5, 33.28). *Third*, the forensic analysis showed that the fraudulent Gmail account in Donnaker's name that was used to open the Ally Bank account was accessed from one or more of the computers from 1622 Rangeley Avenue (Ealy's residence).  The forensic analysis also showed that the Ally Bank account website was accessed from Ealy's residence.  On that same computer

20

the lanceealy@yahoo.com account was repeatedly accessed. *Fourth*, the government presented evidence of Ealy using Donnaker's People's Savings Bank account to make a pizza purchase in the Dayton area, which furthered linked him to the unauthorized use of her personal identifying information.

### 4. Fraud using Cathy Miller's personal identifying information (Counts 45-46).

The government also proved Ealy committed wire fraud and aggravated identity theft (Counts 45 and 46) by using Cathy Miller's personal identifying information and Discover credit card number to purchase a jacket from Pelle Pelle on or about January 23, 2014.

Cathy Miller testified that she did not know Ealy, that Ealy was not authorized to possess or use her personal identifying information, and that he was not authorized to use her Discover credit card. Cathy Miller also testified that she did not purchase a men's size 58-62 leather jacket from Pelle Pelle.

Jana Donaldson, Pelle Pelle's comptroller, testified that an order was electronically placed with Pelle Pelle for a men's leather jacket. (Govt. Exs. 29.1-29.6). As part of that order, a photograph of a driver's license of the buyer "Cathy Miller" was attached, which was necessary for verification purposes and to process the order; this driver's license included Cathy Miller's correct personal information, but contained a false photo. (Govt. Ex. 29.5). The IP address connected to the order was assigned to Defendant's home at 1622 Rangeley Avenue. (Govt. Exs. 29.6).

When agents searched 1622 Rangeley, they located the fraudulent copies of a driver's license in Cathy Miller's name, address, and listing her date of birth, but

which contained a false photograph. (Govt. Exs. 33.1, 33.2, 33.4). A forensic analysis of the computers seized from 1622 Rangeley showed evidence that its user had visited the "Pelle Pelle" website and placed the order in question. There was also evidence on the computers showing internet searches related to Cathy Miller, data about creating fraudulent identification documents, and a scan of the fake Cathy Miller driver's license (Govt. Ex. 22.4A, 22.4C).

Viewing the evidence in a light most favorable to the United States, and for the reasons set forth above, the convictions were supported by sufficient evidence as to each element.

**C. Defendant is not entitled to a new trial.**

Federal Rule of Criminal Procedure 33 permits district courts to "vacate any judgment and grant a new trial if the interests of justice so requires." Fed. R. Crim. P. 33(a). "The paradigmatic use of a Rule 33 motion is to seek a new trial on the ground that 'the [jury's] verdict was against the manifest weight of the evidence." *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010) (quoting *United States v. Crumb*, 187 Fed. Appx. 532, 536 (6th Cir. 2006)). "Generally, such motions are granted only 'in the *extraordinary circumstance* where the evidence preponderances heavily against the verdict.'" *United States v. Graham*, 125 Fed. Appx. 624, 628 (6th Cir. 2005) (quoting *United States v. Turner*, 490 F. Supp. 583, 593 (E.D. Mich. 1979), *aff'd* 633 F.2d 219 (6th Cir. 1980) (emphasis added)); *see also United States v. Hughes*, 505 F.3d 578, 592-93 (6th Cir. 2007) (citing *Turner*). Although the district court may act as a "thirteenth juror" and assess the credibility of the witnesses and

22

weight the evidence in considering a Rule 33 motion, *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998), "[t]he defendant bears the burden of proving the need for a new trial and such motions should be granted *sparingly and with caution.*" *United States v. Turner*, 995 F.2d 1357, 1364 (6th Cir. 1993) (citing *United States v. Seago*, 930 F.2d 482, 488 (6th Cir. 1991)); *see also Willis*, 257 F.3d at 645.

1. **Defendant's convictions are not against the manifest weight of the evidence.**

For these reasons discussed above, there was overwhelming evidence of Ealy's guilt on all forty-six counts. Ealy has not identified a single reason why the jury's unanimous verdict on all counts is against the manifest weight of the evidence. To the extent, Ealy's motion is premised on this generalized notion that justice requires the Court to order a new trial he's identified no reasons for doing so.

2. **The Court properly denied Ealy's last-minute request to waive a jury trial because his waiver was not knowing and intelligent.**

Ealy claims he's entitled to a new trial because the Court denied his last-minute request to waive a jury trial. His claim is meritless.

One month before trial, the Court inquired of Ealy whether he wanted a jury trial:

> THE COURT: Okay. But have you thought about whether or not you want a jury or you want a --
>
> THE DEFENDANT: I thought about it. I think a jury, a jury of my peers will work out okay.
>
> THE COURT: Okay. So that's probably what we're going to be.

    MR. SISTLA: Okay. We'll plan on a jury trial then, Your Honor.

(R. 136, 9-25-14 Tr., 2016.)

  The Court then held in-court status conferences/hearings on October 3, 2014 and October 16, 2014. Although a variety of issues were considered, the Court specifically discussed the jury selection process, including how the Court conducts *voir dire*, the number of strikes each side would receive, and the number of alternatives. (R. 108, 10-3-14 Tr., 1502, 1509-10, 1516-18, 1524-25; R. 114, 10-16-14 Tr., 1618-25, 1630, 1675-78, 1682-83.) The Court also responded to a number of Ealy's concerns regarding jury selection. At no point during either of these in-person status conferences did Ealy waiver from his request for a jury trial.

  On Thursday, October 23, 2014 – the Thursday before trial was to commence – Ealy filed a "notice" purporting to waive a jury trial. (R. 115, Def. Mot. for Misc. Relief, 1688; R. 130, 10-27-14 Tr., 1775-76.) Ealy's motion didn't state why he wanted a bench trial. At the final pretrial conference, however, Ealy explained that he wanted to waive the jury because of the "silent witness rule." (R. 130, 10-27-14 Tr., 1776.) Following an on-the-record discussion with Ealy, the Court determined that the silence witness rule had no applicability in the present case. (R. 130, 10-27-14 Tr., 1776-77.) Because Ealy's attempted waiver stemmed from an erroneous understanding of the law, the Court determined that Ealy's waiver of a jury was not made knowingly and intelligently and denied his request. (R. 130, 10-27-14, 1776-77 ("I do not believe that you understand what you are doing in trying to waive a jury trial, and we are going to proceed with the jury."); 1784-85.); *see also United States*

24

*v. Ealy*, 2014 U.S. Dist. LEXIS 155277, at *22 (S.D. Oh. Nov. 3, 2014). This was not in error.

### 3. Ealy is not entitled to a new trial because the Court properly denied his repeated motions for substitution of counsel.

Ealy argues that he is entitled a new trial because he was denied effective counsel. (R. 175, Second Post-Trial Mot., 3348.) As he did before trial, Ealy persists in his claim that the Court denied him competent representation by appointing Thomas Anderson to represent him. (*Id.*) Ealy also continues to fault the Court for not appointing the counsel of his choice. Ealy's claim fails for multiple reasons.

As a threshold matter, the premise of his argument is wrong. Ealy was not entitled to the counsel of his choice. *See, e.g.*, *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989) (the right to counsel does not guarantee that a criminal defendant will be represented by a particular attorney). In particular, as an indigent defendant who has been appointed counsel, Ealy had "no right to have a particular attorney represent him." *United States v. Iles*, 906 F.2d 1122, 1130 (6th Cir. 1990); *see also United States v. Gonzalez-Lopez*, 548 U.S. 140, 151 (2006) (observing that "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them"); *United States v. Gulley*, 60 Fed. Appx. 538, 542-43 (6th Cir. 2003) (same).

Ealy has also failed to "'demonstrate good cause [necessary] to warrant substitution of counsel.'" *United States v. Marrero*, 651 F.3d 453, 464 (6th Cir. 2011) (quoting *Iles*, 906 F.2d at 1130).

25

On May 21, 2014, this Court appointed Assistant Federal Public Defender Thomas Anderson to represent. (R. 71, Order to Continue, 373.) Mr. Anderson was Ealy's second attorney in this matter. Despite Mr. Anderson's substantial experience trying federal cases, Ealy sought to have him relieved on numerous occasions and have new counsel appointed. Ealy alleged that Mr. Anderson was both "not competent" and "unqualified" to represent him because, among reasons, Mr. Anderson refused to file various motions or subpoena various witnesses. Ealy never alleged, however, that Mr. Anderson refused to meet with him or communicate with him about his case.[12] Nor did Ealy allege that Anderson refused to provide him discovery or any other requested assistance.[13] In light of Ealy's

---

[12] At a status hearing approximately two weeks before trial, Mr. Anderson made the point that he was able to maintain communication with Ealy as both appointed counsel and stand-by counsel.

> MR ANDERSON: Judge, I'm happy to assist in anything with the Court. What I can say is, I've had -- I've spent a lot of time with Mr. Ealy, when I was on the case as his appointed counsel, discussing defenses to the charges and what I believed were relevant witnesses that we would want to call that would be germane to the defense.
>
> What I can inform the Court right now is, I'm happy to file a list of witnesses that he wants subpoenaed for the Court to make a determination as to whether they think they are relevant.
>
> A lot of, I think, the issues between me and Lance, Lance and myself, have to do with basically a fundamental disagreement on what are the important aspects of the case to focus on. But if the Court would like me, as standby counsel, to subpoena these individuals or at least request a subpoena, I will oblige that request.

(R. 108, 10-16-14 Tr., 1522.)

[13] It is true that Ealy didn't necessarily take Mr. Anderson up on his offers but that's a different story. At the October 16, 2014 status hearing, for example, the following exchanges occurred with respect to whether Ealy had listened to certain jailhouse recordings:

> THE COURT: Okay. So, Tom, have you heard the calls?
>
> MR. ANDERSON: I have, Your Honor.
>
> THE COURT: All right. Has Lance heard the calls, if you recall?
>
> MR. ANDERSON: Your Honor, my first meeting with Mr. Ealy we had the calls ready to be played. We did have a discussion about

conclusory allegations of incompetence and conflict, the Court denied Ealy's requests to have new counsel appointed, but permitted Ealy to represent himself *pro se*. (R. 83, 8-26-14 Tr., 560.) The Court also ordered Mr. Anderson to assist Ealy as stand-by counsel. (*Id.*)

In denying Ealy's multiple requests for appointment of new counsel, the Court observed that Mr. Anderson was qualified to represent Ealy. At an August 26, 2014 status hearing, for example, the Court observed: "to date [Mr. Anderson] has not been ineffective and is fully aware of the facts and circumstances surrounding this case and more than able to properly advise Mr. Ealy if Mr. Ealy would listen to him." (R. 83, 8-26-14 Tr., 566.)

Indeed, on multiple occasions, the Court pointed out that Mr. Anderson was competent and fully qualified to represent Ealy:

> THE COURT: From what I've seen, he's abided completely by the Rules of Professional Conduct in terms of conducting himself as a defense lawyer in this case. I have seen no reason – frankly, I don't see any reason why you haven't been able to work with him other than, perhaps, a different philosophy of how things work. But other than that, he's done his job.

(R. 108, 10-15-14 Tr., 1540.)

---

them. Mr. Ealy at that time indicated he did not want to listen to the calls.

(R. 114, 10-16-14 Tr., 1647.)

> THE COURT: Tom, you've actually got a copy of the audio; right?
>
> MR. ANDERSON: I do. It's queued up. Anytime Lance wants to listen to it, it's on our computer at the public defender's office.
>
> THE COURT: I'd listen to it as soon as possible, Lance.
>
> THE DEFENDANT: Yes.

(*Id.*, 1647.)

> THE COURT:  All right. I have not seen that. Mr. Latham was in court. We had a couple of phone calls, I believe, with Mr. Latham and the U.S. Attorney's Office in terms of scheduling. He appeared absolutely competent, was on top of the case. And Mr. Anderson's limited representation, when you let him do the things in court, has been absolutely completely competent up to this point in time. You have been given the documents by the government, and some of the items have actually been produced in an earlier fashion than may be required otherwise in terms of exhibits, *Brady* material, et cetera.

(R. 130, 10-27-14 Tr., 1774.)

> THE COURT:  I then appointed competent counsel, Tom Anderson. I have told you all along that if you wish to retain somebody, you certainly could. And you, in fact, have several motions where you said you wanted to represent yourself. We had a full discussion about that. And the fact that you are unable, apparently, to listen to what counsel says is not my problem. So I have taken, I think, above any beyond the normal steps that I would take in the case in terms of trying to make sure that somebody has counsel.

(R. 130, 10-27-14 Tr., 1815.)

The Court more recently observed that "[t]he record is replete with [Ealy's] repeated and baseless accusations of malpractice against both of his attorneys." *United States v. Ealy*, 2014 U.S. Dist. LEXIS 155277, at *23 (S.D. Oh. Nov. 3, 2014) (citing R. 23, R. 64, R. 74, R. 79, R. 97, R. 130)).  The Court's observations are well-taken.  Ealy never identified any specific instances in which Mr. Anderson (or his predecessor counsel, Mr. Samuel Latham) failed to take appropriate steps to develop his defense or failed to file appropriate and legally relevant motions. Rather, Ealy's complaints amounted to little more than generalized dissatisfaction

28

with his counsel's performance and disagreements with their tactical decisions. Such complaints did not automatically entitle Ealy to new counsel. *See, e.g.*, *United States v. Saldivar-Trujillo*, 380 F.3d 274, 278 (6th Cir. 2004) (dissatisfaction with attorney's responses insufficient to warrant appointment of new counsel); *United States v. Boone*, 437 F.3d 829, 839 (8th Cir. 2006).

The Sixth Circuit has directed courts to consider several factors in evaluating whether a defendant has established "good cause" to warrant appointment of new counsel:

> [1] the timeliness of the motion; [2] the adequacy of the court's inquiry into the defendant's complaint; . . . [3] whether the conflict between the attorney and client was so great that it resulted in a total lack of communication preventing an adequate defense[; and] [4] a balancing of the accused's right to counsel of his choice and the public's interest in the prompt and efficient administration of justice.

*Marrero*, 651 F.3d at 464 (citing *United States v. Jennings*, 83 F.3d 145, 148 (6th Cir. 1996) (quoting *Iles*, 906 F.2d at 1130 n.8)). A weighing of these factors demonstrates that Ealy has failed to establish there was good cause for the Court to appoint new counsel.

With respect to the timeliness of his motions (and very frequent oral requests) for new counsel, Ealy was persistent. At virtually every stage of the proceedings he alleged that his then-counsel (whether it was Mr. Latham or Mr. Anderson) of being ill-equipped (or worse) to handle his defense. Ealy made his demand for a new counsel known to the Court at the half-dozen or so status conferences and hearings between July 2014 and the start of trial at the end of

29

October 2014. The United States therefore acknowledges that Ealy's request for a new counsel was timely in a *broad* sense. But this is the only factor that arguably weighs in favor of Ealy's request for new counsel.

As for the need to make a sufficient inquiry, the Sixth Circuit has held "that, to meet this requirement, the district court *simply must* allow a defendant the opportunity to explain the attorney-client conflict as he perceives it." *Marrero*, 651 F.3d at 465 (emphasis added) (citing *United States v. Vasquez*, 560 F.3d 461, 467 (6th Cir. 2009); *United States v. Chambers*, 441 F.3d 438, 447 (6th Cir 2006); *United States v. Saldivar-Trujillo*, 380 F.3d 274, 278 (6th Cir. 2004)). The Court's inquiry here into Ealy's numerous complaints was certainly more than adequate under these precedents.

On April 14, 2014, at the very first in-court status conference with this Court, Ealy announced that he was dissatisfied with then-counsel, Mr. Latham, stemming from his alleged failure to file certain motions, to ask for a bench trial and to obtain certain unspecified discovery and evidence. The Court thoroughly considered Ealy's concerns and attempted to explain to Ealy why he was not entitled to certain things he was seeking at the time (or at all – as in the case of Ealy's demand to depose witnesses), and why certain motions were unlikely to be very productive (*e.g.*, motion for a bill of particulars). (R. 58, 4-14-14 Tr., 253-267 (colloquy between Judge Barrett and Ealy regarding Mr. Latham's alleged shortcomings).)

Likewise, the Court thoroughly entertained Ealy's complaints against Mr. Anderson during the bond revocation hearing on July 25, 2014. Ealy again

chastised his counsel for failing to file certain motions and subpoena various people. He claimed to have a "conflict of interest" with Mr. Anderson, and the Court explored the nature of the conflict. (R. 78, 7-25-14 Tr., 392-98.) This continued into August 2014.

On August 25, 2014, Ealy filed a *pro se* motion seeking to terminate Mr. Anderson's representation (among other relief). (R. 80, Ealy 8-25-14 Filing, 539.) The Court convened an in-court hearing the next day to address Ealy's claims. Ealy didn't identify any specific issues with Mr. Anderson's representation, aside from declaring that he "[does not want Thomas Anderson [doing] anything with this case." (R. 83, 8-26-14 Tr., 555.) Although the Court attempted to have a dialogue with Ealy regarding his issues, Ealy simply declared that Mr. Anderson was not prepared for the bond revocation hearing. He didn't actually identify any deficiencies in Mr. Anderson's performance, but appeared to simply conclude that Mr. Anderson must have been ineffective if his bond was revoked. This Court, of course, did not agree – noting that Mr. Anderson had "got some pretty good discovery information out in the record which could possibly be helpful later on[.]" (R. 83, 8-26-14 Tr., 551.) The Court also entertained Ealy's complaints that it had failed to appoint a qualified attorney by appointing Mr. Anderson (R. 83, 8-26-14 Tr., 561-62; 572-74.) In this respect, the Court observed that Ealy's "complaint against Mr. Anderson is that he is not qualified, which I strongly disagree with." (R. 83, 8-26-14 Tr., 566. Ultimately the Court rejected Ealy's request to appoint a new counsel because "there [was] no basis for new counsel because [Mr. Anderson], in

31

my estimation, to date has not been ineffective and is fully aware of the facts and circumstances surrounding this case and more than able to properly advise Mr. Ealy if Mr. Ealy would listen to him." (R. 83, 8-26-14, Tr. 572.)

Because there was no basis to appoint new counsel, the Court gave Ealy the choice to represent himself or have Mr. Anderson continue to represent him. (R. 83, 8-26-14 Tr., 555, 566.)  This was perfectly permissible for the Court to do.  *See, e.g., Marrero*, 651 F.3d at 466 ("it was perfectly acceptable to leave [the defendant] with the choice of proceeding with [appointed] counsel or opting for self-representation" where there was no basis to discharge the defendant's appointed counsel) (citing *United States v. Eltayib*, 88 F.3d 157, 168 (2d Cir. 1999) ("Because the denial of [the defendant]'s request for new counsel was proper, it was also proper to explain to [the defendant] that he was thus left with only two options:  keeping this lawyer or proceeding *pro se*.")); *United States v. Buck*, 661 F.3d 364, 373 (8th Cir. 2011) (district court did not abuse its discretion by forcing defendant to choose between appointed counsel and proceeding *pro se* where there was no evidence that counsel had been ineffective and court repeatedly advised the defendant of the perils of self-representation) (citing *United States v. Mentzos*, 462 F.3 830, 838 (8th Cir. 2006); *United States v. Swinney*, 970 F.2d 494, 498 (8th Cir. 1992)); *see also United States v. Green*, 388 F.3d 918, 921 (6th Cir. 2004) ("[A] persistent, unreasonable demand for dismissal of counsel and appointment of new counsel is the functional equivalent of a valid waiver of counsel.") (internal quotation marks and alterations omitted).

Even though Mr. Anderson was no longer Ealy's counsel of record, Ealy continued to lodge complaints against him. During the September 11, 2014 status conference, Ealy argued that Mr. Anderson was "automatically disqualified" from working on his case because Ealy had purportedly filed a bar complaint against him. (R. 99, 9-11-14 Tr., 698.) Ealy maintained that the filing of a bar complaint results in an automatic conflict of interest between him and Mr. Anderson. (*Id.*) That's not the law. Several courts have observed that the threat of – or the actual filing of a disciplinary complaint – does not create a *per se* conflict of interest between an attorney and his client. *See, e.g.*, *United States v. Rodriguez*, 612 F.3d 1049, 1054-55 (8th Cir. 2010) (citing *United States v. Burns*, 990 F.2d 1426, 1438 (4th Cir. 1993); *Winfield v. Roper*, 460 F.3d 1026, 1040 (8th Cir. 2006); *Carter v. Armontrout*, 929 F.2d 1294, 1299-1300 (8th Cir. 1991); *Smith v. Lockhart*, 923 F.2d 1314, 1321 n.11 (8th Cir. 1991)). This is with good reason. A defendant could always generate an artificial conflict by merely filing a complaint, even if it lacked any merit. And as the Court correctly noted, the filing (or alleged filing) of the bar complaint "doesn't create a conflict of interest necessarily." (R. 99, 9-11-14 Tr., 698.)

Ealy also insisted that Mr. Anderson was incompetent and had revealed attorney-client communications to the Government. (R. 99, 9-11-14 Tr., 697-99.) The Court entertained all of Ealy's complaints and found them lacking. (*Id.*) Ealy even claimed that Mr. Anderson was incompetent because he "can't even get discovery on hard paper." (R. 99, 9-11-14 Tr., 698.) The Court pointed out that wasn't the case because discovery could be produced on "media-type formats." (R.

33

99, 9-11-14 Tr., 699.) And Mr. Anderson told the Court that he and a colleague from the Federal Public Defenders' Office were ready to review the discovery with Ealy but he refused to do so. (R. 99, 9-11-14 Tr., 699.) The Court also cleared the courtroom in order to have a sealed discussion with Ealy to address his other concerns regarding Mr. Anderson's representation. (R. 99, 9-11-14 Tr., 700.)[14]

At the October 3, 2014 status hearing, Ealy repeated again that Mr. Anderson had been ineffective. He lodged two specific complaints at this hearing: that Mr. Anderson refused to issue various subpoenas (R. 108, 10-3-14 Tr., 1539-40) and Mr. Anderson refused to work with his father and Brian Krebs. (R. 108, 10-3-14 Tr., 1543.) The Court again heard out Ealy's complaints and found them without merit. Mr. Anderson represented that he would be happy to work with Ealy to subpoena any relevant witnesses. (R. 108, 10-3-14 Tr., 1522.) Mr. Anderson also detailed for the Court that he had substantial discussions with both the Government and Ealy regarding the forensic evidence and potential need for a defense expert. (R. 108, 10-3-14 Tr., 1492-93, 1495-96.)

Approximately two weeks later, the Court held another status conference. Ealy claimed that Mr. Anderson had never received discovery and no discovery was produced until September 10, 2014. (R. 114, 10-16-14 Tr., 1617.) That was neither true nor a basis to disqualify Mr. Anderson from representing Ealy (whether as appointed counsel or on a stand-by basis). The United States produced discovery on

---

[14] This was not the only instance of the United States leaving the courtroom during a status hearing. Throughout this matter, the United States several times – whether on its own initiative or at the Court's request – left the courtroom in order to permit Ealy to have a candid discussion regarding his attorneys and/or legal strategies with the Court.

a rolling basis since March 2014 to both Ealy and his various counsels. The United States had also offered Ealy a reverse proffer on numerous occasions and had met with both Mr. Anderson and Mr. Latham at least a dozen times to discuss the government's case against Ealy. (R. 114, 10-16-14 Tr., 1617.) Indeed, Ealy himself acknowledged receiving discovery at an earlier hearing. (R. 79, 5-21-14 Tr., 518-19, 530-31.) Most significantly, the Court again indulged Ealy and allowed him to voice his various complaints. There was no need, however, to conduct an in depth inquiry into Ealy's claims. They were not only basically retreads of his earlier complaints, but they were also completely unsupported by the record.

Finally, on the eve of trial, Ealy again demanded that the Court appoint new counsel of *his* choice because Mr. Latham and Mr. Anderson were allegedly ineffective. (R. 130, 10-27-14 Tr., 1773, 1819, 1826.) Putting aside the fact that Ealy wasn't entitled to counsel of his choosing, *see, e.g.*, *Iles*, 906 F.2d at 1130, the Court yet again addressed Ealy's allegations and found them to be without merit because there was no evidence that either of his attorneys were ineffective or incompetent. (R. 130, 10-27-14 Tr., 1773-74; 1812-21, 1826.)

Ealy also never demonstrated that there was a total lack of communication with Mr. Anderson. To the contrary, Ealy routinely relied on Mr. Anderson for both pretrial matters (*e.g.*, filing a motion to reinstate Ealy's bond) and during the trial itself. Mr. Anderson conducted *voir dire* at Ealy's request, gave an opening statement (together with Ealy), cross-examined a number of witnesses, argued evidentiary objections, and generally assisted Ealy throughout the trial (until Ealy

35

fled). Moreover, Mr. Anderson – to his credit – made numerous efforts to meet with Ealy (and his father) to discuss the government's case. Mr. Anderson also met with Ealy while he was incarcerated for violating his bond conditions, which included discussing (or attempting to discuss) the government's discovery, forensic evidence, and theory of the case. Ealy and Mr. Anderson also had "meaningful conversations" regarding the government's plea offer. (R. 114, 10-16-14 Tr., 1668-69.)

Indeed, Ealy's complaints against Mr. Anderson amount to little more than his frustration that Mr. Anderson would not blindly follow his (and his father's) strategic direction. (*See, e.g.*, R. 108, 10-3-14 Tr., 1539-40 (Ealy claims the only conflict we have now is regarding the subpoenaing of various witnesses); *id.*, 1543 ("Only conflict I see is Tom Anderson not working with me, Brian Krebs and my father."); *see also* R. 108, 10-3-14 Tr., 1540 (the Court observing that Mr. Anderson is abiding by rules, and noting that it "[saw] no reason – frankly, I don't see any reason why you have not been able to work with him other than, perhaps, a different philosophy on how things work").) The record also reflects that Ealy would stymie Mr. Anderson's attempts to convey information about the government's case (*See, e.g.*, R. 130, 10-27-14 Tr., 1779-80.)

In short, there wasn't a total breakdown of communication between Ealy and Mr. Anderson. Ealy had plenty of opportunities to speak with Mr. Anderson. Mr. Anderson time and again represented to the Court that he was willing to meet with Ealy. Mr. Anderson also made substantial efforts to help advise Ealy (and prepare for trial) by meeting with the United States on numerous occasions to discuss the

36

government's case, evidence and theory of prosecution. No doubt that Ealy was dissatisfied with Mr. Anderson's advice. But that standing alone does not establish a total lack of communication between them. *See, e.g.*, *United States v. Saldivar-Trujillo*, 380 F.3d 274, 278 (6th Cir. 2004) (dissatisfaction with the responses from one's lawyer, rather than a lack of opportunity or an inability to talk to one's lawyer or contact one's lawyer, does not establish a total lack of communication). Nor do disagreements over the law or its application to a particular case. *See, e.g.*, *Marrero*, 651 F.3d at 466 (observing that disagreements over the law or the application of the law to the facts in a particular case are not the types of disagreements sufficient to permit the dismissal of counsel); *United States v. Garner*, No. 12-cr-65 (JMH), 2015 U.S. Dist. LEXIS 10530, at **7-8 (E.D. Ky. Jan. 28, 2015) (refusing to dismiss counsel and observing that "the Sixth Amendment does not guarantee that [the defendant] will be represented by an attorney who agrees with him, especially when [the defendant's] own take on the law is misguided at best."). Indeed, the record reflects multiple instances in which Ealy ignored Mr. Anderson's advice to attend a reverse proffer, review the discovery, or view critical pieces of evidence. There wasn't a breakdown of communication because Ealy refused to cooperate with Mr. Anderson. Nor did it constitute good cause for substituting counsel. *See, e.g.*, *United States v. Vasquez*, 560 F.3d 461, 468 (6th Cir. 2009).

Finally, the prompt and efficient administration of justice outweighs Ealy's interest in having a counsel of his own choice. Even though Ealy was not

constitutionally entitled to a counsel of his own choice, his desire to have a new counsel appointed stemmed not from any actual deficiencies in the representation he was receiving but rather his refusal to work with appointed counsel. He avoided reviewing the discovery. He avoided confronting the government's evidence. And he insisted in filing legally unsound motions (which often misstated the record). Ealy had months to review the discovery and consult with highly trained and experience legal counsel. He simply refused to do so. The public's interest in prompt administration of justice is certainly favored in circumstances such as here where the defendant's efforts to obtain new counsel appear to be disingenuous and mostly designed to delay and frustrate the parties and the court. *See, e.g.*, *United States v. Exson*, 328 F.3d 456, 460-61 (8th Cir. 2003) (concluding the district court did not abuse its discretion in declining substitute counsel where the court "allowed [the defendant] several opportunities to present his concerns about his attorney" and the defendant's allegations were inadequate to support the appointment of new counsel).

### 4. Ealy is not entitled to a new trial because the Court properly denied his motion for a continuance on the eve of trial.

Ealy argues that he is also entitled to a new trial because this Court denied his continuance on the eve of trial. (R. 175, Dec. 1 Mot. for New Trial, 3348.) He contends that a continuance was necessary in light of the voluminous discovery in this case. (*Id.*) Ealy's claim is belied by the record. He had months of access to the discovery, but choose not to review it. He declined the government's repeated invitations to participate in a reverse proffer. And he refused the assistance of

38

counsel to review discovery and the evidence in this case. He also told the Court less than a month before trial that he was ready to proceed on October 27th. The Court did not abuse its discretion by denying Ealy's last minute request for a continuance.

The decision whether to grant a continuance is committed to the sole discretion of the district court. The Sixth Circuit has observed that the denial of a continuance rises to the level of a constitutional violation only if the district court displayed "an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for a delay." *United States v. Crossley*, 224 F.3d 847, 855 (6th Cir. 2000) (internal quotation marks omitted). The defendant must also show that the denial resulted in actual prejudice to the defendant's defense, which may be "established by showing that a continuance would have made relevant witnesses available or added something to the defense." *Id.* (internal quotation marks omitted). Because "'[t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process,'" the inquiry depends upon the circumstances of the case and "'particularly . . . the reasons presented to the trial judge at the time the request is denied,'" with the recognition that "[a] reasonable time for adequate preparation of the accused's defense is the first essential of trial fairness." *United States v. Garner*, 507 F.3d 399, 408 (6th Cir. 2007) (quoting *Ungar v. Sarafite*, 376 U.S. 575, 588-91 (1964)). The Court of Appeals has identified several non-dispositive factors as relevant in evaluating whether the denial of a continuance amounts to a due process violation:

> the length of the requested delay; whether other
> continuances had been requested and granted; the
> convenience or inconvenience to the parties, witnesses,
> counsel and the court; whether the delay was for
> legitimate reasons or whether it was "dilatory, purposeful
> or contrived;" whether the defendant contributed to the
> circumstances giving rise to the request; whether denying
> the continuance will result in identifiable prejudice to
> defendant's case; and the complexity of the case.

*Powell v. Collins*, 332 F.3d 376, 396 (6th Cir. 2003).

On September 19, 2014, out of an abundance of caution, the United States alerted the Court that Ealy may be seeking a continuance of the October 27, 2014 trial date. (R. 98, U.S. Resp. to *Pro Se* Due Process Complaint, 673-74 (responding to Ealy's September 18, 2014 filing) (R. 97).)  In response, the Court held a status conference with the parties on September 25, 2014.  The Court had previously indicated that the October 27th date was "firm." (R. 83, 8-26-14 Tr., 576.)

At the September 25th hearing, the Court inquired about Ealy's potential request for a continuance.  Ealy stated:

> Well, as far as the continuance, I'm going to – I'm going to
> defer on continuing the trial. I'm going to keep the current
> trial date. As far as discovery, I'm going through it. I'm
> already on the seven-thousandth page, so I think it's
> pretty much going pretty well for me.

(R. 136, 9-25-14 Tr., 2004.)

Ealy also noted:

> As far as discovery, I'm going through it . . . I think it's
> pretty much going pretty well for me.

(R. 136, 9-25-14 Tr., 2004.)

And Ealy ultimately concluded that:

Umm right now I'm just moving forward with trial.

(R. 136, 9-25-14 Tr., 2016.)

During this same hearing, Ealy also specifically instructed Mr. Anderson not to ask for a continuance on his behalf. (R. 136, 9-25-14 Tr., 2014.)

The Court held a follow-up status conference on October 3, 2014. At this hearing, the Court engaged in a substantial dialogue with Ealy regarding whether he would like to keep the October 27th trial date. Ealy began by indicating that "[u]nless we can resolve it . . . I want to proceed." (R. 108, 10-3-14 Tr., 1484.) The Court again inquired whether Ealy would like to stick with the October 27th trial date, and again Ealy responded "Well, um, I do." (R. 108, 10-3-14 Tr., 1488.) Finally, the Court emphasized that it was Ealy's decision whether to proceed or not on October 27th:

> THE COURT: The ball is in your court. If you want additional time, if you want a new lawyer, we'll try to find somebody else for you, appoint him, but this person from Cleveland hasn't shown up. You have indicated that you're ready to go to trial. You don't want to waive your Speedy Trial. So I'm leaving the ball in your court on this.

(R. 108, 10-3-14 Tr., 1489-90.)

> THE COURT: So I need to know from you what you want to do. Do you want more time? Do you want to go to trial on the 27th, or what? I'm trying to flesh this out. Because once Mr. Sistla starts the preparations in terms of issuing subpoenas and whatever else he has to do to bring people in, once that – and that may have already started. But after today, we're going to go forward because we're not going to reschedule all that stuff.

(R. 108, 10-3-14 Tr., 1490.)

41

> THE COURT: I would entertain appointing new counsel to help you, but that is not going to be – we're not going to able to keep a trial date if that happens; I can [guarantee] you that. Nobody is going to step on this case with a couple of weeks to go.
>
> THE DEFENDANT: Um, well, I guess I'm going to proceed. I'm going to proceed with trial. I just need all the contact information from all the witnesses because I need to interview them, too, because I need to confirm their statements. I need all contact information of all complaining witnesses[.]
>
> THE COURT: So the question is, I want to make absolutely clear now: You want to proceed with trial on the 27th; is that correct?
>
> THE DEFENDANT: Yes.

(R. 108, 10-3-14 Tr., 1491.)

For its part, the United States noted its opposition to any future requests for a continuance:

> MR. SISTLA: Also, the government's position would be that since Mr. Ealy has indicated that he's ready to go to trial on October 27 and the government has thus far expended substantial resources in subpoenaing and securing multiple out-of-state witnesses, that the government would oppose any continuance asked in the future by Mr. Ealy.

(R. 108, 10-3-14 Tr., 1527.)

Finally, the Court reiterated that the October 27th trial date was firm:

> THE COURT: All right. As pointed out by Mr. Sistla, we have an October 27 trial date, and that's going to be a hard date, and that's what we are doing. Everybody is going to have to be prepared.

(R. 108, 10-3-14 Tr., 1537.)

For the next three weeks, Ealy did not once mention the need for a continuance. At the October 16, 2014 status conference, for example, Ealy never once raised the need for additional time to review discovery. It was not until October 27, 2014 – the day before jury selection – that Ealy orally sought a continuance. (R. 130, 10-27-14 Tr., 1773.) Confusingly, Ealy also seemed to assert a Speedy Trial objection. (R. 130, 10-27-14 Tr., 1770.) In response to Ealy's request, the Court stated:

> You told me in open court approximately two or three weeks ago that everything was fine, you had time to look at the documents and you would be ready for trial this week.
>
> * * *
>
> You do what you need to protect what you believe your rights are, Mr. Ealy. But I've been more than patient with you, and we're going to move forward to trial. We're going to start with jury selection tomorrow morning at ten o'clock.

(R. 130, 10-27-14 Tr., 1774-75.)

The Court did not abuse its discretion by denying Ealy a continuance based on his alleged need for more time to review the discovery. The United States provided Ealy with discovery on a rolling basis beginning in March 2014. (*See, e.g.*, R. 47, U.S. Resp. to *Pro Se* Def. Mot. for Secret Service Affidavit, Ex. A & Ex. B, 197-204; R. 79, 5-21-14 Tr. 516-17 (representation by Mr. Latham that Ealy has been provided all of the discovery that had previously been provided to counsel).) After Ealy terminated his first attorney (Samuel Latham), the United States produced discovery directly to Ealy. (R. 79, 5-21-14 Tr., 518-19, 530-31 (Ealy acknowledging receipt of discovery).) On May 21, 2014, the Court appointed Mr. Anderson to represent Ealy. The United States thereafter provided Mr. Anderson with the discovery it had previously produced to Mr. Latham and Ealy. The United States also continued to make rolling discovery production to Mr. Anderson while he

was both Ealy's attorney and stand-by counsel. (*See, e.g.*, R. 83, 8-26-14, Tr. 558-59

(Mr. Anderson representing that Ealy had received all discovery on disk by August

26, 2014 and noting the government has provided discovery.) After Ealy terminated

Mr. Anderson at the end of August, the United States then printed out the entire

discovery in hard copy and produced it (and notified Ealy of its availability):

> MR. SISTLA: Your Honor, we -- the government believe
> it's produced all [of] the relevant discovery in this case. In
> fact, pursuant to the Court's request, we produced
> additional materials that we don't feel fall under Rule 16,
> namely the Liberty Reserve records that belong to Mr.
> Ngo. Those were provided to Mr. Ealy.
>
> We've also gone ahead, in advance of the trigger time for
> our *Jencks* obligations, and produced Jencks material in
> this case for several witnesses. We are supplementing
> those disclosures as appropriate. I believe Mr. Anderson
> picked those up Friday or Thursday – Thursday or Friday
> of last week. The government had completed its discovery
> within 99.5 percent several weeks ago.
>
> With respect to Mr. Ealy's claim that he received the
> discovery for the first time on September 10th: as this
> Court knows, I have previously represented that the
> government had produced voluminous discovery, almost
> all of the discovery, prior to September 10th. Then we
> reproduced it in paper form to Mr. Ealy beginning on
> September 10th. We made numerous overtures to Mr.
> Ealy to come and look at the discovery, we would make
> arrangements for him to look at the discovery, and
> Mr. Ealy did not take us up on any of those offers.

(R. 130, 10-27-14 Tr., 1778-79; *see also* R. 99, 9-11-14 Tr., 704-05 (government

attorney discussing surveillance video evidence); R. 114, 10-16-14, Tr. 1617

(government's representation regarding offers of reverse proffers and noting that

the Court had recommended that Ealy take up the government's offer; government

representing that it had met with Ealy's stand-by counsel a dozen times or so to discuss the evidence).)

Mr. Anderson also stated on the record that he had made efforts to review the government's discovery with Ealy, but he either declined or the efforts went nowhere. (*See, e.g.*, R. 99, 9-11-14 Tr., 699 (Mr. Anderson's representation that he attempted to review discovery with Ealy in his office but that those "meetings did not bear much fruit").)

In short, Ealy had months to review the discovery. He had multiple opportunities to attend a reverse proffer where the United States would have outlined its theory of the case (and in any event his attorneys had participated and could have provided him detailed background on the government's case if he only agreed to meet with them). A substantial portion of the United States' evidence with respect to Counts 43-46 of the Second Superseding Indictment were laid out at the bond revocation hearing in July 2014 – nearly three months before trial commenced. Ealy was also provided the United States' witness list several weeks before trial. The record establishes that Ealy was provided ample time to review the discovery and prepare for the case. Moreover, Ealy *rejected* the Court's overture approximately a month before trial for additional time. He insisted on going to trial on October 27th and stayed quiet of the need for more time.

The Court's decision to deny a continuance here did not arise from some unreasonable and arbitrary insistence to keep the October 27th trial date. The Court gave Ealy an opportunity to have more time, but Ealy declined the offer.

Ealy also cannot show that he was actually prejudiced by the Court's refusal to grant to grant a continuance. Ealy has not explained how the additional time would have "added something to defense" or made a *relevant* witness available that wasn't otherwise free. Indeed, the Court had been quite generous with setting a trial schedule – Mr. Anderson was appointed Mr. Ealy's counsel on May 21, 2014, but the Court did not set trial until the end of October – nearly five months later. Despite having this time and the resources of the Federal Public Defender's office, Ealy was dilatory in reviewing the discovery. Indeed, he went so far to reject efforts by his counsel to review the discovery with him. There can be little doubt that Ealy contributed to the circumstances giving rise to the request. It is also of no consequence that Ealy was incarcerated for a time pretrial. From November 2013 (when he made his initial appearance) until July 25, 2014, Ealy was free on bond any able – if so willing – to review the discovery in this matter. Ealy has only himself to blame for having his bond revoked. But regardless, even while incarcerated, Ealy was free to review discovery with the assistance of counsel. He chose not to. That Ealy refused to confront the evidence against him – both while free and while incarcerated – lends further support to the Court's decision to deny his request for a continuance on the eve of trial.

The Court also properly rejected Ealy's request for a last-minute continuance because it would have greatly inconvenienced the government's witnesses and counsel. The government's case-in-chief included over 70 witnesses, a majority of whom lived outside of the State of Oho. There can be no doubt that granting Ealy a

46

continuance the day before trial would have caused a substantial hardship for many of these witnesses.  It would have also created a logistical nightmare for the United States to try to reschedule the testimony of seventy plus individuals.  On this record, Ealy simply did not have a legitimate reason for seeking to delay the trial.

### 5. Ealy is not entitled to a new trial because this Court denied his motion for appointment of a new counsel on the eve of trial.

Ealy also claims he is entitled to a new trial because the Court denied appointing him Cleveland-based lawyer, Craig Weintraub, the day before jury selection.  Though not absolutely clear, Ealy suggests the Court may have also erred by not both appointing Mr. Weintraub and granting a continuance.  The Court properly denied Ealy's request for to appoint Mr. Weintraub for two reasons.  *First*, Ealy wasn't entitled to the lawyer of his choice. *See, e.g.*, *Gonzalez-Lopez*, 548 U.S. at 151 (observing that "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them"); *Iles*, 906 F.2d at 1130.  *Second*, Ealy was dilatory in identifying him by waiting until until the eve of trial.

For the reasons discussed above, the Court did not have to appoint Ealy a new attorney – and Ealy wasn't entitled to one – because Ealy had failed to show good cause for replacing Mr. Anderson.  But even putting that aside, the Court did not abuse its discretion by denying Ealy's last minute attempt to bring in Mr. Weintraub when considering the substantial disruption it would have caused to the trial and the fact that Ealy was himself responsible for the delay.

In the months leading up to trial, Ealy repeatedly claimed that he had a potential attorney in Cleveland.  The Court in turn repeatedly inquired about the

status of the lawyer, but Ealy never provided any specifics. He first raised the possibility of having a "lawyer in Cleveland" at the August 26, 2014 hearing. Ealy did not, however provide any specifics – no name, no phone number, no email address, nothing – regarding this alleged attorney. (R. 83, 8-26-14 Tr., 552.) At the very next hearing, on September 11, 2014, Ealy again made a claim about having a potential "lawyer in Cleveland," but yet again provided no specifics. (R. 99, 9-11-14 Tr., 682; *see also id.* 700-01.) He did offer to provide information about this unnamed lawyer by September 18, 2014. (R. 99, 9-11-14 Tr., 707.) That never happened. At the next hearing, September 25, 2014, Ealy was still unable to provide any specifics about this alleged Cleveland lawyer. (R. 136, 9-25-14 Tr., 1997.) He did, however, acknowledge the Court's comment that unless it hears from someone in Cleveland, "we're going to stay on the same track" for the October 27th trial date. (*Id.*) On October 3, 2014, the Court held another status hearing. Ealy was still unable to provide any specifics about the so-called "Cleveland lawyer," but indicated that this unknown lawyer would be unable to prepare for trial in time. Nevertheless, Ealy did not want a continuance. (R. 108, 10-3-14 Tr., 1484.) At the October 16, 2014 status conference, it was the same thing – Ealy still had not identified the lawyer from Cleveland, although this time he claimed the lawyer would be "ready for trial." (R. 114, 10-16-14 Tr., 1660-61.) It is not until the October 24 – the Friday before trial – that Ealy finally identified Mr. Weintraub as the "Cleveland lawyer." Ealy's papers (R. 121) included a representation that Weintraub was ready to make an appearance. This was not true.

Mr. Weintraub has never represented Ealy. In correspondence with the United States, Mr. Weintraub stated that he "do[es] not represent him" and "would never get involved in a pro bono in another district." (*See* U.S. Resp., Ex. A, Email Correspondence from A. Sistla to C. Weintraub.) Ealy nevertheless made filings with Mr. Weintraub's name in the signature block. He also represented to the Court at the final pretrial conference that Mr. Weintraub was ready to "get on the case." (R. 130, 10-30-14, 1768.) That led to the following exchange between the Court and Mr. Ealy:

> THE COURT: Number two, I think if you go back and check the transcripts, I must have asked ten times, "What's going on with the Cleveland guy?" I never had his name.
>
> THE DEFENDANT: Okay.
>
> THE COURT: "What's going on?" And you said, "Nothing yet. Nothing yet. Nothing yet."
>
> THE DEFENDANT: Okay.
>
> THE COURT: Probably a dozen times on the record. And then the day before trial you say you want this person to show up? It's not happening, Lance. Okay?
>
> THE DEFENDANT: Well, I was unable to be in contact with him because I was incarcerated. So how can I find a lawyer from in jail?
>
> THE COURT: First of all, you said your dad and he either met or talked. Your dad is not incarcerated. You had said --
>
> THE DEFENDANT: Okay.
>
> THE COURT: Stop. And you were not incarcerated from the time – well, I don't know what the time period is you

49

were out on bond before you violated the terms and conditions, but you were obviously able to do a lot of contact with other people during that period of time. Mr. Anderson, I'm sure, would have reached out to this guy if you wanted to. So the day before trial I'm not dealing with new counsel, especially appointed new counsel.

\* \* \*

THE COURT: You are not being denied counsel. You are being denied this guy who you have brought in at the eleventh hour when we have had numerous discussions in the past about counsel. I've heard about a person from Cleveland, still haven't seen him, I don't know who he is, haven't even heard from him that he's ready to come in. All right? That's usually the way it happens. I get a phone call from a lawyer that says, "Judge, I'd like to take this case. There may be some issues." I'll work it out with him and discuss it, possibly. But I haven't heard word one from this lawyer, so that issue is dead. All right?

(R. 130, 10-27-14 Tr., 1816-18.)

Ealy also claimed that Weintraub was ready to go to trial. (R. 130, 10-27-14, Tr. 1817.)  That wasn't true either. *See Ealy*, 2014 U.S. Dist. 155277, at *9 (Mr. Weintraub would not be prepared to go to trial until approximately February 2015).

On this record, the Court did not abuse its discretion by refusing to appoint Mr. Weintraub (assuming he would have even accepted such an appointment) and continuing the trial.  Ealy repeatedly misled the Court about the status of the so-called "Cleveland lawyer."  For months, he provided no specifics.  And it was only at the "eleventh hour" that Ealy revealed to the Court (and the government) the identity of this potential attorney.  Aside from the fact that Mr. Anderson is highly qualified and was perfectly competent to handle Ealy's defense, there is nothing in the record that suggests Mr. Weintraub would have agreed to represent Ealy.

50

The Court also did not abuse its discretion by refusing to continue the trial in order for Mr. Weintraub to take on Ealy's case.  Ealy was the one responsible for the delay in identifying Mr. Weintraub.  He offers no legitimate reasons why he did not provide Mr. Weintraub's name to the Court months earlier.  In this respect, Ealy waiting until the eve of trial to announce Mr. Weintraub's "representation" appears contrived with the purpose of delaying the trial for no good reason.  There is also little doubt that continuing the trial would have substantially prejudiced the government – namely it would have been extraordinarily inconvenient for the government to reschedule a complex trial involving more than seventy witnesses (a substantial number of whom live outside of Ohio) and several thousand pages of exhibits.  In the end, Ealy cannot identify how he was prejudiced by the Court's refusal to allow Mr. Weintraub to represent him.  He's never explained or demonstrated how Mr. Anderson was incapable or unable to effectively represent him in this case.

### 6. The United States did not act vindictively be seeking a superseding indictment.

Ealy claims that the government acted vindictively by seeking a superseding indictment.  He alleges that the United States sought a superseding indictment to punish him for not cooperating.  This is not only untrue, but reflects a fundamental misunderstanding of the law.

It has been long recognized that prosecutors have "'broad discretion" in deciding whom to prosecute.  *United States v. Ladeau*, 734 F.3d 561, 566 (6th Cir.

2013) (quoting *Bragan v. Poindexter*, 249 F.3d 476, 481 (6th Cir. 2001). As the

Sixth Circuit explained in *Ladeau*:

> Because plea bargaining offers a mutuality of advantage
> to defendants and prosecutors, and because the
> prosecution's ability to threaten a reluctant defendant
> with heightened charges is a necessary feature of a robust
> plea bargaining process, increased charges resulting from
> a breakdown of the plea bargaining process are not
> deemed vindictive, regardless of the fact that the
> prosecutor's goal is to persuade the defendant to forgo his
> constitutional right to stand trial.

*Id.* at 569 (internal citations and quotation marks omitted).

Accordingly, so long as the Government engaged the defendant in "the give-

and-take" compromise though which he can negotiate a benefit, it does not violate

the defendant's constitutional rights. *Id.* (quoting *Bordenkircher v. Hayes*, 434 U.S.

357, 362 (1978)). That is exactly what occurred here.

The government never sought Ealy's cooperation. After obtaining the

original indictment, the United States attempted to engage in plea negotiations

with Ealy (through his then-counsel, Samuel Latham). To this end, the United

States invited Ealy to attend a reverse proffer and made clear that it would seek a

superseding indictment if the parties could not reach a negotiated resolution.

During the reverse proffer in February 2014 with Samuel Latham, the United

States previewed the evidence it had obtained (subsequent to his arrest in October

2013 and the first indictment) relating to the potential new charges. Ealy declined

to attend the reverse proffer. He declined to engage the United States in any plea

negotiations. Accordingly, the United States sought a superseding indictment after

52

plea negotiations failed to materialize based largely on new evidence relating to the filing of false claims with the IRS (filing false tax returns), wire fraud, mail fraud, aggravated identity theft, and access device fraud. This was entirely proper. *See, e.g.*, *United States v. DeJohn*, 368 F.3d 533, 545 (6th Cir. 2004) ("This circuit has consistently indicated that when the right asserted by the defendant is simply the right to go to trial, an additional charge entered after a failed plea bargain cannot, after *Hayes*, form the substance of a viable vindictive prosecution claim.") (citations omitted).

### 7. Defendant's allegation of judicial bias lacks merit.

Ealy resurrects his bias complaints in his Post-Trial Motions, alleging the Court should recuse itself and grant a new trial based on judicial bias grounds. (R. 173, 3064-3065; R. 175, 3336, 3348). The Court previously addressed Defendant's similar requests for recusal, and denied the same.[15] (R. 80; 84; 85; 99, 679).

To justify recusal, a defendant must show the bias is based on extrajudicial acts or involves judicial conduct that is so "extreme that it displays clear inability to render fair judgment." *United States v. Adams*, 722 F.3d 788, 837-838 (6th Cir. 2013) (quoting *Liteky v. United States*, 510 U.S. 540, 551 (1994)); *see also United States v. Anderson*, 84 Fed. Appx. 513, 516 (6th Cir. 2003); *Zimmer v. United States*, 780 F.2d 1024 (6th Cir. 1985). Pointing to allegedly erroneous or atypical judicial rulings in a matter is insufficient to demonstrate recusal is necessary. *Anderson*, 84 Fed. Appx. at 516. "Opinions formed by the judge on the basis of facts introduced or

---

[15] In his earlier filings, Defendant's complaints largely revolved around the Court's rulings revoking bond and appointment of counsel, along with conclusory allegations of bias.

events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky*, 510 U.S. at 555.

Ealy attaches a litany of conclusory complaints in his Post-Trial Motions (R. 173, 3058, 3064-3065; R. 175, 3336, 3348), which are insufficient to establish bias.[16] To the extent that Ealy identifies particular acts in support of his bias claim, they were rulings made by the Court during various stages of the litigation. Furthermore, nothing about the rulings cited by Ealy suggest that the Court held a "deep-seated favoritism or antagonism" that affected its judgment.[17] Indeed, the Sixth Circuit – in rejecting Ealy's mandamus petition – found that Judge Barrett "has demonstrated no antagonism toward Ealy." *In re: Lance Ealy*, No. 14-4065, Order at 2 (R. 135, Sixth Cir. Mandamus Order, 1992.)

Because the allegations in his motions are either conclusory or based on rulings made by the Court in its judicial capacity, Ealy has failed to demonstrate that recusal was appropriate in the past or now. Both his motion for recusal and motion for new trial should be denied.

---

[16] Examples include "The above mentioned Judge has in the past deliberately violated the defendant's personal liberties and/or has wantonly refused to provide due process and equal protection to the defendant . . . ." (R. 175, 3333) and "trial judge acted improperly using and ignoring the laws of the State of Ohio and the United States to deprive the Defendant of federally-protected rights." (*Id*. at 3368).

[17] The Court actually addressed the merits of some of Defendant's motions despite being untimely.

54

## CONCLUSION

For the foregoing reasons, the Court should deny Ealy's *pro se* motions in their entirety.

Respectfully submitted,

CARTER M. STEWART
United States Attorney

/s/Alex R. Sistla
ALEX R. SISTLA (241760 CA)
ANDREW J. HUNT (0073698)
Assistant United States Attorney
Federal Building
200 West Second Street, Suite 600
Dayton, Ohio 45402
Telephone: (937) 225-2910
Fax: (937) 225-2564
Dated: February 9, 2015          alex.sistla@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served this 9th day of February 2014 to all counsel of record via the Court's ECF system.  Because of Defendant Lance Ealy's fugitive status, service could not be effectuated on Mr. Ealy at this time.

/s/Alex R. Sistla
ALEX R. SISTLA (241760 CA)

# EXHIBIT A

## Sistla, Alex (USAOHS)

| | |
|---|---|
| **From:** | Sistla, Alex (USAOHS) |
| **Sent:** | Saturday, October 25, 2014 5:48 PM |
| **To:** | 'Craig Weintraub' |
| **Subject:** | RE: Question Regarding Representation of Federal Defendant |

Hi Craig,

Thank you again for your quick response.  I assumed as much, but I just wanted to confirm that fact because Mr. Ealy's filings suggest that you might be representing him on either a pro bono basis or through Court appointment.  Because we have a status conference scheduled for October 27, 2014, I wanted to make an accurate representation to the Judge regarding your representation – or rather – lack of representation of Mr. Ealy.

Thanks for your time this weekend.

Best,
Alex

**From:** Craig Weintraub [mailto:cweintraub@hotmail.com]
**Sent:** Saturday, October 25, 2014 5:46 PM
**To:** Sistla, Alex (USAOHS)
**Subject:** Re: Question Regarding Representation of Federal Defendant

I am in Cleveland and would never get involved in a pro bono in another district. I told him I am cja in this district.

*Sent from my Verizon Wireless 4G LTE DROID*

"Sistla, Alex (USAOHS)" <Alex.Sistla@usdoj.gov> wrote:

Dear Mr. Weintraub,

Thank you for the quick response.  One follow-up question – would or have you been asked to take on a *pro bono* representation of Mr. Ealy?

Best,
Alex

**From:** Craig Weintraub [mailto:cweintraub@hotmail.com]
**Sent:** Saturday, October 25, 2014 4:59 PM
**To:** Sistla, Alex (USAOHS)
**Subject:** Re: Question Regarding Representation of Federal Defendant

I do not represent him.

*Sent from my Verizon Wireless 4G LTE DROID*

"Sistla, Alex (USAOHS)" <Alex.Sistla@usdoj.gov> wrote:

Dear Mr. Weintraub,

My office is currently prosecuting an individual by the name of Lance Ealy in *United States v. Ealy* (13-cr-175) in the Southern District of Ohio. Yesterday afternoon Mr. Ealy made several *pro se* filings (see attached) that suggest you may be representing him in this matter. Could you confirm whether or not you are representing Mr. Ealy?

Best regards,
Alex

**Alex R. Sistla**
Assistant U.S. Attorney
Southern District of Ohio
U.S. Courthouse & Federal Building
200 W. Second Street, Suite 600
Dayton, OH 45402
(937) 531-6795
alex.sistla@usdoj.gov